UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
UNITED STATES OF AMERICA,


     – against –                                     No. 23-cr-004 (JHR)

BEN WERCZBERGER,

                            Defendant.

-------------------------------------------------------------------------x


---

## SENTENCING MEMORANDUM OF DEFENDANT BEN WERCZBERGER

---


**MEISTER SEELIG & FEIN PLLC**
*Attorneys for Ben Werczberger*
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
Fax: (212) 655-3535

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BEN'S PERSONAL HISTORY AND CHARACTERISTICS MERIT A TIME-SERVED
        SENTENCE: HIS ACTIONS IN HIS 72 YEARS HAVE EXEMPLIFIED HARD WORK,
        CHARITY, AND FAMILY COMMITMENT ................................................................ 2

        A.      From Humble Beginnings, Ben Werczberger Built a Successful Business Through
                Hard Work, Creativity and Compassion ............................................................ 3

                1.      *Ben Werczberger was Raised in a Modest Home, Where the Trauma and
                        Tragedies his Family Suffered in the Holocaust Cast a Long Shadow* ...... 3

                2.      *For Decades, Ben has Led his Business With Humility and Care for his
                        Employees and Partners* ......................................................................... 5

        B.      For Decades, Ben Has Shared his Success With Community Members Most in
                Need ............................................................................................................... 7

        C.      Ben Werczberger is A Consummate Family Man, Devoted to Each of his Children
                and Grandchildren Individually ...................................................................... 12

                1.      *Even as Adults, Ben's Children Look to him for Daily Care,
                        Companionship, and Guidance: A Testament to Ben's Dedication to his
                        Family* ................................................................................................. 12

                2.      *Ben is Extraordinarily Close with his Grandchildren, and Takes an Active
                        Role in Their Daily Lives* ...................................................................... 15

III.    THE   GUIDELINES   THEMSELVES   RECOMMEND   A   NON-CUSTODIAL
        SENTENCE ...................................................................................................... 17

        A.      Ben's Sentencing Guidelines are Properly Calculated at an Adjusted Offense Level
                of 6, Corresponding to a Guidelines Range of 0-6 Months ................................ 17

        B.      The Guidelines Provide For a Presumption for a Non-Custodial Sentence.......... 18

IV.     A TIME SERVED SENTENCE IS SUFFICIENT TO ACHIEVE THE TWIN AIMS OF
        FEDERAL SENTENCING: DETERRENCE AND REHABILITATION ..................... 19

        A.      Ben is Deeply Sorry for His Crime..................................................................... 20

        B.      Ben's Acceptance of Responsibility and Active Progress Towards Rehabilitation
                Serve as a Positive Model, Achieving General Deterrence ................................. 22

V.      THE PSR RECOMMENDS A TIME SERVED SENTENCE BASED ON THE
        REALITIES OF BEN'S LIFE AND THE LIMITED NATURE OF HIS OFFENSE
        CONDUCT ....................................................................................................... 25

VI.     CONCLUSION.................................................................................................. 29

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ......................................................................... 2

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ......................................................................... 3

*United States v. Hamilton*,
    323 F. App'x 27 (2d Cir. 2009) ................................................................................. 23

*United States v. Hodges*,
    07-cr-706, 2009 WL 36231 (E.D.N.Y. Feb. 12, 2009) ............................................ 23

*United States v. Oldani*,
    09-cr-00010, 2009 WL 1770116 (S.D.W. Va. June 16, 2009) ................................ 24

*United States v. Ortega*,
    09-cr-742, 2010 WL 2541364 (E.D.N.Y. June 17, 2010) ....................................... 22

*United States v. Pizzino*,
    419 F. App'x 579 (6th Cir. 2011) ............................................................................ 24

*United States v. Sanchez*,
    99-cr-2007 WL 60517 (S.D.N.Y. Jan. 8, 2007) ...................................................... 23

*United States v. Slater*,
    04-cr-48 (JSR), 2012 WL 6808470 (S.D.N.Y. Dec. 28, 2012) ................................. 2

**Statutes**

18 U.S.C. § 3553 .................................................................... 1, 2, 19, 22, 24, 25, 29

**Rules**

U.S.S.G. §4C1.1 ......................................................................................................... 19

U.S.S.G. § 2B1.1(b)(9)(A) ......................................................................................... 18

U.S.S.G. § 5C1.1(b) .............................................................................................. 18, 19

**EXHIBIT LIST**

| |
|---|
| **Exhibit A: Ben Werczberger Letter** |
| **Exhibit B: Family Letters** |
| Dovi Dembinsky |
| Esther Dembinsky |
| Rachel Dembinsky |
| Riki Dembinsky |
| Shana Dembinsky |
| Michael Friedman |
| Toby Friedman |
| Rachel Kraus |
| Pessi Mayerson |
| Rochelle Mayerson |
| Chesky Werczberger |
| Jacob Werczberger |
| Miriam Werczberger |
| **Exhibit C: Community and Charity Letters** |
| Herman Goldberger |
| Rabbi Knobloch |
| Yossi Lowy |

| |
|---|
| Central United Talmudical Academy of Monsey |
| Eizer L'Shabbos |
| Hina V'Hisda Jerusalem |
| Moshia Organization |
| Shalvat Habayit |
| **Exhibit D: Jeffrey Geller, MD Letter** |

Defendant Ben Werczberger respectfully submits this sentencing memorandum in support of his request for a sentence of time served and six months of supervised release.

## I.    INTRODUCTION

The sentencing statute provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary."  18 U.S.C. § 3553(a).  And per the sentencing statute, considerations *beyond* Ben's crime—for which he has fully and openly accepted responsibility—merit significant weight in determining what sentence is required here.

Looking at Ben's life in totality, other than this case, he has lived not just a blameless life, but an exemplary one.  Perhaps most telling of his character, Ben is first and foremost the consummate patriarch of his large family.  Each of his three adult children, and more than a dozen grandchildren, shares a close personal bond with Ben.  Ben would, and frequently does, drop everything to help with whatever family situation arises.  Whether a child or grandchild is experiencing medical stress, separation anxiety during the first time away from home, or just the mundane difficulties trying to navigate the often bumpy transitions into adulthood, Ben is the first call.  Whatever the issue, Ben's family knows that they can count on him.  Even during this last nearly two years when Ben himself bore the immense stress of criminal prosecution, he has put his family's needs first.

Ben's public life has also been typified by actions that we, as a society, should hope all will emulate. At 72 years old, he has never had a single prior encounter with the criminal justice system.  After growing up in a modest family that suffered immense tragedies during the Holocaust, and struggling financially as a young adult, Ben Werczberger built a successful business in middle age.  He did so through his persistence, hard work, creativity, and attention to the opinions and perspectives of his partners and employees.  Tiger Companies, which Ben

founded approximately 30 years ago, was among the first e-commerce businesses selling wholesale architectural supplies. It now boasts numerous divisions selling a diversity of products from professional durable medical equipment, to janitorial supplies, and kitchen cabinets designed for developers, among others. Tiger employs well over 100 people, providing stable jobs to many in the local community.

Throughout the last several decades, Ben has also shown immense charity to many in his community. Ben has consistently contributed generously to organizations providing food, rental assistance, educational funding, medical and psychological care, and other crucial services to the least among us. He has devoted not just his money, but his time and community connections to those in need and the organizations that help them. Through his quiet, and often anonymous, donations and help, Ben has for years been a charitable mainstay in his community.

These realities of Ben's life should be central to the Court's crafting a just sentence. Given Ben's family and community work, only time served sentence is sufficient but not greater than necessary. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").

## II. BEN'S PERSONAL HISTORY AND CHARACTERISTICS MERIT A TIME-SERVED SENTENCE: HIS ACTIONS IN HIS 72 YEARS HAVE EXEMPLIFIED HARD WORK, CHARITY, AND FAMILY COMMITMENT

The first factor that the Court is instructed to consider under the sentencing statute is "the nature and circumstances of the offense and the history and characteristics of the defendant." *United States v. Slater*, No. 04-cr-48 (JSR), 2012 WL 6808470, at *1 (S.D.N.Y. Dec. 28, 2012) (quoting 18 U.S.C. § 3553(a)(1)). "The Guidelines virtually ignore this measure of the man, but

here as elsewhere the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).  Ben's lifetime of hard work, decades of charity, and exceptional devotion to his large family warrant a time served sentence.

      **A.**      **From Humble Beginnings, Ben Werczberger Built a Successful Business Through Hard Work, Creativity and Compassion**

              **1.**      ***Ben Werczberger was Raised in a Modest Home, Where the Trauma and Tragedies His Family Suffered in the Holocaust Cast a Long Shadow***

    Ben was born in Toronto, Canada to parents who survived the unimaginable horrors of the Holocaust.  Prior to the War, both of Ben's parents lived in the Transylvania area of Eastern Europe.  Ben's father, who was 51 when Ben was born, and Ben's mother who was 45 at the time, both lost family in the Nazi death camps.  Six of Ben's father's children, as well as his first wife were murdered by the Nazis in Auschwitz.  Only Ben's father's two oldest sons, who were young adults at the time of the War, survived with their father.  Ben's parents met in the trauma and tumult of post-War Europe, where Ben's three full-siblings were born.  The Holocaust cast a pall over Ben's family.

    The family's economic circumstances were modest.  Ben's family moved from Toronto to the larger Hasidic community in Williamsburg, Brooklyn when Ben was about 9 years old.  In Brooklyn, Ben's father worked long hours as a ritual slaughterer (a "*shochet*") to support the family.

    Ben got married to his wife Miriam when he was barely more than 20 years old.  And he struggled to support his new family.  For years, Ben held two jobs just to make ends meet.  During the day, he worked a salesman for a local stationary company, and later for a local copier and toner supplies business.  Several nights a week, Ben also worked at a bakery, slaving for hours over a hot oven.  Adding to Ben's financial strain, as a young man, he suffered from appendicitis and

severe kidney stones, requiring him to undergo two surgeries just months apart. Because he did not have health insurance at the time, Ben's health woes also compounded his economic struggles: his out of pocket medical bills mounted, and it took Ben years to pay off those debts. *See* Ex. B, Miriam Werczberger Ltr. at 1 ("In the early years of our marriage, (1972) Ben faced serious health issues that took a toll on our life and finances. Two years into our marriage, when our first child was just six months old, Ben suddenly had late-diagnosed appendicitis in September 1974, which required an emergency appendectomy. He then spent an extended time in the hospital due to a severe infection. Just three months later, he was back in the hospital with kidney stones, and in January 1975, he underwent another major surgery, staying another 10 days in the hospital. At that time, I was eight months pregnant with our second child, who was born a month later. These health crises left us with overwhelming medical bills and debt.").

But Ben was committed to doing so. As his wife Miriam recalls:

> Despite the hardships, Ben remained determined to repay every last dollar and took on the responsibility himself. While our parents offered financial help, Ben wanted to shoulder the responsibility of making good on his word. Instead, he took on a second job, and started working nights at a bakery twice a week to help make ends meet.

Ex. B, Miriam Werczberger Ltr. at 1

Ben's granddaughter in law, Rachel Dembinsky, has heard many stories of this time in Ben's early life. She is in awe of "what a hard worker he is." Ex. B, Rachel Dembinsky Ltr. Rachel describes that Ben would "always tell" his grandchildren "that making a living wasn't easy and that it takes a lot of effort and a very strong work ethic." *Id.* Specifically:

> He always tells us stories of how he would stand in the heat of the bakery oven and knead with his own hands three hundred loaves of bread a day! This was all happening when he was suffering from kidney stones and other medical conditions that required surgeries and other medical interventions. The medical bills would clean out his accounts to the point that he had to take loans to be able to keep up with the financial burdens. All that money was paid back up to the last penny! Even if it took him years, he never forgot anybody he took a dime from. Knowing him

now, it's hard to believe that he had such a hard past but when he tells these stories I can see from the twinkle in his eyes that he is proud of his hard work and his record of honesty. He is my inspiration.

*Id*.

In 1994, after years of struggling in middling sales positions, Ben opened his own business. At first, Ben's business sold toner and copier supplies, as he had for his prior employer. Soon, however, Ben found a niche market, selling specialized architectural copy supplies. From there, Ben's company identified an opportunity to sell architectural survey equipment—his was the first company to sell architectural supplies online.

Over years of hard work, Ben's business evolved and thrived due to his creativity, and trust in his business partners and employees. Soon, Ben and his business partner Herman Goldberger, founder Tiger Medical, selling durable equipment to medical offices, such as examining tables, specialized medical cabinets, and the like. From there, Tiger Companies expanded to include several other divisions, selling a diverse array of products ranging from kitchen cabinets for developers (Tiger Cabinets) to janitorial supplies (Tiger Supplies), among others. Ben's business employs over 100 employees who have good, stable jobs in the local Tri-State area. *See* PSR ¶ 78.

### 2. *For Decades, Ben has Led his Business With Humility and Care for his Employees and Partners*

What is remarkable about Ben's business is not merely his success, but the kind and humble way in which he conducts himself in his business life. Ben's business partner of 24 years, Herman Goldberger, describes how he and Ben have "embarked on numerous entrepreneurial ventures, navigated challenges, and celebrated successes." Ex. C, Herman Goldberger Ltr. at 1. Herman credits those successes in large part to the fact that their "partnership" has always been "built on a foundation of trust and mutual respect, has flourished thanks to Ben's unwavering commitment to

honesty, fairness, and transparency." *Id*. at 1; *accord id*. at 2 ("Despite the absence of formal written agreements, our partnership has thrived due to Ben's unwavering adherence to our handshake agreements. His honesty, transparency, and equitable approach to resolving conflicts have been instrumental in maintaining the harmony and success of our ventures.").

Those virtues, and Ben's unwavering belief in the potential of his younger partner and employees, have proved crucial. Herman recalls that at the outset of their business journey together, "Ben Werczberger's unwavering belief in my potential changed the trajectory of my life. At 30, unemployed and uncertain, he invested in me, co-founding a business where he not only imparted invaluable industry knowledge but instilled the core values of integrity, honesty, and long-term vision." *Id*. at 1. Instilling confidence in Herman, allowed the partners to "transform[] a fledgling venture into Tiger Companies, boasting $100 million in sales." *Id*.

Herman recalls how Ben's leadership and understanding transformed a potentially partnership-ending mistake by Herman into a valuable learning opportunity. "Despite facing a substantial loss due to a purchasing error I made early in our business journey, Ben's response was a testament to his exceptional leadership and mentorship. Instead of reproach, he offered invaluable guidance, teaching me to discern fraudulent suppliers and navigate challenges with resilience." *Id*. Perhaps more than anything, Ben's compassion in the face of even frustrating business errors, brought out the best in Herman. Ben's "unwavering support and refusal to dwell on past mistakes not only fostered a culture of growth but also instilled in me the confidence to overcome adversity and evolve as a business professional." *Id*.

Ben's understanding nature is not limited to his partner alone. He exhibits the same care towards each of the "over 100 people" employed in Tiger Companies. *Id*. at 2. As such, "Ben has become known in the company as the 'go-to' person for any personal issues, our employees saw

him as a father figure, someone you can confide [in], a person with a good ear and lots of compassion and wisdom to guide them on the right path." *Id.* Ben's empathy and flexibility towards one longtime employee exemplifies his approach towards his employees:

> During a deeply challenging period in his life, our division manager faced the heart-wrenching task of caring for his ailing wife and five children. In an extraordinary display of compassion, we provided him with full-time leave, continuing his payroll support for three years until his wife's passing. Even after her passing, on Ben's initiative, we extended our assistance, granting an additional four months of paid leave to help him navigate the transition to single parenthood and stabilize his family life.

*Id.*

Ben's kindness simply pervades everything he does in business. His son Jacob, who has worked for Ben for nearly 30 years, attests to that. When he started working in his father's business, Jacob "found out quickly that although I knew my father personally and intimately, I had yet to know him truly, and I was astounded by his professional dealings and work relationships." Ex. B, Jacob and Susan Werczberger Ltr. at 1. Even though he was the company founder and the boss, Ben "never raised his voice to a co-worker, customer, or vendor, no matter how stressful the day was. He could compartmentalize work stress from dealing with people and family matters." *Id.* Ben's exceptional compassion and humanity, even in the often cut-throat business world, is a testament to his true character.

## B.    For Decades, Ben has Shared his Success With Community Members Most in Need

Ben has made a point of sharing his successes with the least fortunate members of his community. Unlike many defendants who commence their charitable works on the day after their arrest, Ben has prioritized charity for decades. The half-dozen letters from charities attached, represent just some of the organizations that Ben has consistently assisted for years.

7

For example, Lipa Dautch, Founder and CEO, Eizer L'shabbos, which is a charitable organization that "distributes over 250 packages of food each week to needy families, as well as provides assistance with tuition and rent" to needy members of the Jewish community in New York describes how Ben's contributions to the organization "[f]or the past 20 years. . . ha[ve] played a pivotal role in [the] efforts to alleviate the hardships faced by individuals and families in need."  Ex. C, Lipa Dautch, Founder and CEO, Eizer L'shabbos, Ltr. at 1; *accord* Ex. C, Central United Torah Academy of Monsey Ltr. ("At a moment's notice, without hesitation and without questions, he stands ready to provide much-needed funding and other assistance whenever the need arises.  This is all done without fanfare, only with grace and humility.  Our organization is deeply grateful for Mr. Werczberger's generosity and he is an inspiration to us all."); Ex. C, Moshia Organization Ltr. (describing Ben's contributions to the organization, which provides psychological care, treatment and assistance to needy individuals and their families); Ex. C, Hina V'Hisda Organization in Jerusalem Ltr. (praising Ben's steadfast support for the charitable organization that helps needy families, particularly orphans and widows); Ex. C, Shalhevet Habayit Ltr.

He is also the first to quietly help friends in need, without fanfare or social approbation. As Ben's wife Miriam recounts:

> Just one example of Ben's generosity is when a friend of ours living overseas, who has a child born with a severe health problems, called us from Israel asking for a loan and saying that their insurance wouldn't cover an exorbitantly expensive and necessary surgery to help their child. Without any hesitation, Ben wired the money to cover the expense. This was almost a decade ago, and not only does he never ask for repayment, but he also goes out of his way to avoid running into his friend to spare him any shame, discomfort, or embarrassment.

Ex. B, Miriam Werczberger Ltr. at 2.

Ben's charitable contributions extend beyond just financial assistance.  As Lipa Dautch describes: "[o]ne of Mr. Werczberger's most remarkable qualities is his unwavering dedication to

seeking out opportunities to support our organization. Through his efforts, he has successfully identified food suppliers willing to donate to our cause, thereby helping to ensure that we can continue to provide essential assistance to those in need." Ex. C, Lipa Dautch, Founder and CEO, Eizer L'shabbos, Ltr. at 1. Ben's son similarly explains how "[w]hen a charity case came to [Ben's] attention, he instantly whipped out his checkbook to help out as much as possible." Ex. B, Jacob and Susan Werczberger Ltr. at 1. But Ben never stops there. Financial assistance "was followed up with a call to inquire what else was needed, whether a doctor, a referral, or a lawyer; he did whatever it took to complete that situation." *Id*.

Ben's charity and community investments also bear his personal touch. Ben's business partner Herman Goldberger explains how "Ben demonstrated extraordinary compassion and initiative by intervening on behalf of a single father and his son, when the son was at risk of expulsion from school due to behavioral issues." Ex. C, Herman Goldberger Ltr. at 1. Ben could not just solve the issue with a contribution. Instead, he personally "successfully advocated to the school principal for the child's reinstatement on the condition of seeking outside help, subsequently arranging and financing weekly therapy sessions, showcasing remarkable generosity and commitment to the well-being of others." *Id*.

Even before Ben achieved financial success in business, he used his more limited resources to aid the community. Ben's daughter Pessi recalls that when she was growing up, her father would routinely "open[] his home to guests and many times complete strangers." Ex. B, Pessi Mayerson Ltr. at B. Pessi describes how she "grew up just a few blocks from Maimonides hospital in Brooklyn." *Id*. Recognizing that many families of ill patients would need a place to stay, her "parents turned [their] basement into a small apartment with a private entrance to be used strictly for people who need to stay close to the hospital near loved ones who have been hospitalized." *Id*.

Ben went further yet, as "there also wasn't a Friday night [Sabbath] dinner that we didn't host someone at our table. Many of them who started out as strangers became family." *Id.*

Ben has also invested his time and financial resources into making his own community in Florida warm and hospitable. "[T]hree years ago," Ben "recogniz[ed] the need for a warm synagogue to the ever-growing community," where he lives in Florida. Ex. C, Rabbi Benjamin Knobloch Ltr. at 1. So, "he single-handedly undertook the monumental and costly task to build a beautiful synagogue which serves a broad and diverse community and is a beacon of warmth and hospitality, welcoming all who enter with open arms and hearts." *Id.* at 1-2. Ben personally shepherded the long process of building the synagogue. "This undertaking required Ben to take a personal responsibility by guaranteeing the lease, navigating the permit application process, hiring architects and contractors, and tirelessly shuttling between New York and Florida until the synagogue was fully completed, a harrowing process which took nearly 2 years to complete." *Id.* at 2. Now, to Ben's enormous credit, "the synagogue provides a safe and welcoming space for people to gather fostering an atmosphere of inclusivity and warmth." *Id.*; *accord* Ex. C, Yossi Lowy Ltr. ("The community was in need of another shul/synagogue. Among the earlier residents, we had spoken about starting one for years, but it took Benzion and Miriam to finally get one up and running. It began as a small alternative minyan— group of at least ten people praying together— but quickly became the fastest growing Shteibel (Heimish, home-grown synagogue) in the village. As soon as I heard about it, I immediately wanted to be a part of the endeavor and have been by Benzion's side this entire time creating and developing the shul and turning it into the success that it is. He trusted me from the get-go with advice and ideas for the construction.").

Ben is not just the big man on campus in his synagogue. He makes sure to attend to the community members who require the most individual care and discrete consideration. For

example, he spends time daily "chauffeuring a 97-year-old congregant to and from the synagogue," and "[w]hen Ben is not around to drive, he arranges a daily ride for this elderly individual."  Ex. C, Rabbi Benjamin Knobloch Ltr. at 2.  Similarly, Ben looks out for "a congregant with dementia" who on more than one occasion "forgot his phylacteries at home (necessary for morning prayers)." *Id.*  Each time, Ben paused his own morning prayers to "retrieve the [phylacteries] from his condo, sparing the elderly gentleman any potential embarrassment."  *Id.*; *accord* Ex. C, Yossi Lowy Ltr. ("In another instance, we had an issue with one of the congregants who would mistakenly help himself (sadly an early dementia) to the money from the charity box.  Benzion never said a word. He didn't want to embarrass this elderly, respectable man. At one point, when the money taken was a significant amount, he asked me to approach the man about the issue but to do it with the utmost sensitivity giving him a way out so to prevent any embarrassment. The lengths Benzion goes to make everyone feel welcomed and included is unprecedented.").

Yossi Lowy, who is a congregant, caretaker, and administrator at the synagogue attests that it is Ben's "love and respect for others that bring people to this [synagogue]."  Ex. B, Yossi Lowy Ltr.  Ben "is so careful not to hurt anyone and goes beyond the call of duty to make sure no one is ever offended—which in other places happens more often than you think."  *Id.*  Yossi is "truly amazed at the respect, sensitivity and kindness [Ben] bestows upon every fellow human being." *Id.*  That is Ben Werczberger's true character.

### C.    Ben Werczberger is A Consummate Family Man, Devoted to Each of His Children and Grandchildren Individually

#### 1.    *Even as Adults, Ben's Children Look to him for Daily Care, Companionship, and Guidance: A Testament to Ben's Dedication to his Family*

Ben Werczberger is the father of three adult children, Jacob, Esther and Pessi, grandfather to 15, and great-grandfather to 17.  He is a superlative family patriarch, caring for his children and grandchildren both financially and with his loving guidance.

When Ben's children were young, he did everything in his power to provide them with protection and stability—even when his own life, and economic circumstances were precarious. Ben's daughter Pessi describes:

> Growing up, my father never lost his temper, he never yelled at us, when we got into trouble at school, we would always call him (and beg him not to tell my mom :)) he disciplined us all while never losing his cool. I really thought growing up that his life was perfect.
>
> Only as a teenager did I realize that it wasn't that life was perfect but that he made us feel as though it was. We had emotional security. As we grew up we became aware of things that had happened that we hadn't been aware of like him suffering tremendous financial losses when the stock market crashed in '87 or when he had a health scare and had something removed from his lungs… life went on as usual, we were completely oblivious. He made sure that life for his family was always carefree and stable.

Ex. B, Pessi Mayerson Ltr. at 1.  Well into his children's adulthood Ben continues to put his children first, no matter his own life stresses and circumstances: "Even now as adults when he isn't feeling well or in this situation, he is always calming us down, he is always reassuring us that everything is going to be ok." *Id*.

Ben's son Jacob similarly reports that he can always turn to his father for understanding, guidance, and support in a tough time.  One instance when Jacob sought counsel from Ben after Jacob (then a young father) was fired from his job is typical:

I got married, started my own family, and needed to go out and support my family. With a solid education in hand, all thanks to him and his work ethic as my guide, I joined the workforce. Hard work and an honest living are all I ever knew from my parents. My first few jobs weren't easy, but my father, an employee himself at the time, was constantly there to give me strength, advice on coping, and support when there was a shortfall. I remember being fired from a job while trying to feed my family of 4, and all I could do was head straight to my father before I got home. He calmed me down, gave me some money, and, most importantly, talked me off the ledge, giving me emotional support and a pep talk that I still recall up to this moment.

Ex. B, Jacob and Susan Werczberger Ltr. at 1.

Pessi likewise describes her father's steadfast support, to the exclusion of his own feelings,

when she had a health scare some years ago:

There was this one time, about ten years ago, I thought I had breast cancer, I found a lump and I was convinced I was dying. Every time I called my dad- which was often due to the shear panic I needed to dump onto someone- he was so unruffled, he reassured me that it was nothing, that I was fine and although that seems like a basic from a parent, there was this sincerity and calm in his tone that led me to believe that what he was saying was true. He was able to convince me I'd be ok. Later, after we received test results showing no cancer, I found out my father had been panicked the entire time- rightfully so, his youngest baby daughter (as he lovingly calls me) might be sick. He had turned over the entire NYC to find me the best doctors to go to, he gave charity in my name and flew across the Atlantic on a moment's notice to pray on my behalf. My dad dedicates his life to his kids, it doesn't matter what is going on outside of him, if we need him, he is there along with all his compassion and grace.

Ex. B, Pessi Mayerson Ltr. at 1.

Even in business, Ben's soft paternal side has guided his relationships with his children,

never permitting the stresses of work to eclipse his role as a father.  Jacob has worked by his

father's side for decades.  And although ordinarily mixing family relationships with business can

be a contentious combination, that has never been the case with Ben.  For example, Jacob recounts:

[T]he day I found out my wife was expecting twins during a hectic Friday in the office. I knocked on his door to share the news while he was on an important phone call with one of our big accounts. He immediately noticed I had something important to say, as reading people is his superpower, and he promptly hung up the phone. For the next half hour or so, nothing mattered as much as the news of my family at hand.

Ex. B, Jacob and Susan Werczberger Ltr. at 1.

This incident, and Ben's patience have been not only a stabilizing force throughout his children's lives, but a model for their interactions with their own children (Ben's grandchildren). Jacob frequently recalls Ben's reaction on that emotional day at the office when Jacob learned he would soon be a father to twins, as the quintessential example of how to best interact with his own children who now work for him in the family business. Jacob explains: "As I am currently in a similar situation, running the family business and my kids working for me, this is something that I try very hard to emulate, but it's easier said than done." *Id*.

To this day, Ben is the glue holding the family together. Pessi reports that "I talk to my dad at least once a day"—because her relationship with her father is naturally so close, she assumed that was the norm. Ex. B, Pessi Mayerson Ltr. at 1 ("My friends find it absurd that I talk to my dad at least once a day. Until someone pointed that out to me i just assumed everyone who still has a dad did the same."); Ex. B, Miriam Werczberger Ltr. at 2 ("As a husband and father, Ben has been a constant support for our family. . . . His daily phone calls to them are a clear sign of how much he cares and how important he is to them.").

And neither Pessi, nor the rest of the family, call Ben out of a sense of obligation, as do so many children. Pessi is clear:

> I call my father because I genuinely want to chat with him. I know he's the only one that really wants to hear exactly how my day went. . . . I always tell him that the reason my kids and my siblings kids all call him weekly and have an amazing bond with their grandfather is a testament to him. They feel his sincere concern when something's wrong as well as his sheer joy when sharing good news.

Ex. B, Pessi Mayerson Ltr. at 1. Ben's son Jacob perhaps sums up best Ben's indelible impact on his children, explaining that Ben's "positive outlook on life, great attitude, and emotional support fortified me going forward until today." Ex. B, Jacob and Susan Werczberger Ltr. at 1.

      2.       *Ben is Extraordinarily Close with his Grandchildren, and Takes an Active Role in Their Daily Lives*

Ben has always been a hands-on grandfather.  He relished playing with his grandchildren when they were young.  And now that they are grown, he stands ready to help his young adult grandchildren navigate the sometimes stressful transition into independence and adulthood.

Beginning when his grandchildren "were super little" they "adored 'Zeidy' (grandpa)." Ex. B, Jacob and Susan Werczberger Ltr. at 2.  Ben "formed a tight bond with every child."  *Id*. Ben "took a supreme interest in their education and taught and studied together with each child at their own level. He always praised the kids for whatever talents he saw in them." *Id*.  When his grandchildren were just kids, Ben was always the fun grandfather.  His daughter-in-law Susan "clearly remember[s] the hundreds of times we BBQed together, with the kids hanging all over the 'zeidy' and him handing out treats and toys and generally bonding." *Id*.  Ben spent many hours playing his "favorite game" with his grandchildren, "Backgammon," and "[t]he competition was always fierce. . . he instilled in [the grand]kids a drive to excel and succeed." *Id*.

Now that his grandchildren are young adults, "they still absolutely adore their grandfather and look to him for guidance and support in their own lives." *Id*.  The anecdotes in Ben's children's letters are emblematic of his close relationships with each of his grandchildren.  Ben's daughter Esther describes that Ben:

> [I]s the one person [the whole family] instinctively turn[s] to when we need or want anything. Case in point, when my daughters and my nieces went to seminary abroad they only wanted my father, their grandfather, to escort them. And by escort I mean actually fly with them and take them shopping when they landed for last minute needs; some necessary and some not so much.

Ex. B, Esther Dembinsky Ltr.  "[A]mazingly, as teenagers and young adults," his grandchildren "wanted to make the trip and transition to school and life abroad with their grandfather"—a real testament to the depth of their relationship.  Ex. B, Miriam Werczberger Ltr. at 2 ("One of the

clearest examples of Ben's deep care for his grandkids and close bond with them was when he personally flew with them to their overseas school and Yeshiva on multiple occasions. He wanted to make sure they arrived safe and sound, so he took on this responsibility himself. Ben didn't want their parents to have to leave the rest of the family behind, so despite his business and home responsibilities, he made these trips to ensure their safe arrival and getting them settled in.").

Ben's grandchildren "know that they can count on him for anything because he loves them unconditionally and is always proud of them. It's a really special connection they treasure."  Ex. B, Esther Dembinsky Ltr.   For example, when Ben's grandson was 19 years old and "studying abroad . . . he noticed a bulge on his neck that was very alarming. He called [his parents] in a panic."  *Id*.  Ben, however, was the family member who "without any hesitation, was on the first available flight out."  *Id*.  Ben's daughter Esther explains that it was Ben who "was able to calm my son down just by being there and navigating the foreign medical system to get him the proper attention he needed. He is the one person we can always depend on to keep calm and get things done. . . . He is our rock."  Ex. B, Esther Dembinsky Ltr.

Even just recently, amidst Ben's personal stresses of this criminal prosecution against him, Ben has prioritized supporting his grandchildren when they have faced difficulties in their own lives.  Ben's newlywed granddaughter, Rochelle Mayerson, describes how Ben has been her support and comfort through her transition into married life:

> I recently got married and moved down to Florida where my grandparents spend most of their time. Now, the first year of marriage is hard and moving is hard so let's just say it's been a tough year. From the moment I landed, my grandfather called to check in. He treated us to dinner and even helped me stock up my apartment with all the needed grocery items. Many of my friends have grandparents living in Florida but for them visiting is a check on a to do list, for me it's my compass as I adjust to a new city.
>
> I mean this genuinely, in May of last year, my husband was rushed to the emergency room at Mount Sinai because of what we thought was a stomach ulcer. I was so lost, I was worried about my husband's health, I was confused about what our

16

insurance covered… one phone call to my grandfather and I was immediately reassured that I was taken care of. That if I needed somebody he was there. The next day he drove down from Deerfield Beach to Miami Beach, over an hour drive, to bring us homemade chicken soup and a familiar face in a moment of need. I have so much love and respect for him.

Ex. B, Rochelle Mayerson Ltr. at 1.

Ben's more distant family can similarly count on him when they need help. Ben's son Jacob describes that when Ben's "niece . . . was trying to get out of an abusive marriage; that niece became [like] his daughter." Ex. B, Jacob and Susan Werczberger Ltr. at 1. Whether his niece needed "money" or a means to "support her and her kids, money for the lawyers, daily advice, and emotional support" Ben was there and he "did not tire" until his niece "was settled and remarried" happily. *Id*.

Ben's children and grandchildren know that there is no way [they] can ever pay him back" for his daily "love, guidance, support, but most of all, his Heart and Soul!" Ex. B, Jacob and Susan Werczberger Ltr. at 2. All they "can try to do is pay it forward" and "hope and strive to emulate his good deeds and keep on making him proud!"—which is all Ben seeks in return. *Id*.

Throughout his 72-years, Ben has always put his family first. His dozens of progeny know that they can count on him—and they do. The lifetime or work that Ben has invested in building a stable family, a successful business, all through his sheer devotion and perseverance weigh significantly in favor of a time served sentence.

## III. THE GUIDELINES THEMSELVES RECOMMEND A NON-CUSTODIAL SENTENCE

### A. Ben's Sentencing Guidelines are Properly Calculated at an Adjusted Offense Level of 6, Corresponding to a Guidelines Range of 0-6 Months

While both the PSR and the plea agreement properly calculate Mr. Werczberger's advisory Guidelines range at 0-6 months imprisonment, *see* Plea Agr. ¶ C; PSR ¶¶ 88, 90, the PSR erroneously calculates Mr. Werczberger's adjusted offense level at 8 rather than 6. *Compare* Plea

17

Agr. ¶ C *with* PSR ¶ 53.  Although all agree that Mr. Werczberger's Sentencing Guidelines are minimal—at the 0-6 month range—the lower adjusted offense level is accurate.

The PSR arrives at this calculation by adding +4 levels under U.S.S.G. § 2B1.1(b)(9)(A), rather than +2.  *See* PSR ¶¶ 46, 88, 90.  Specifically, Paragraph 46 of the PSR states that:

> A two-level increase is warranted because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or government agency, pursuant to § 2B1.1(b)(9)(A). As the resulting offense level is less than 10, an additional two levels are added so it is increased to 10.

PSR ¶ 46.  However, because after the +2 for Mr. Werczberger's role in the offense is added to the Guidelines calculation his offense level is 10, only 2 levels are should be added under U.S.S.G. § 2B1.1(b)(9)(A).

Thus, after adjustments for acceptance of responsibility (minus 2) and Mr. Werczberger's status as a zero-point offender (minus 2), Mr. Werczberger's correct adjusted offense level is 6.  *See* Plea Agr. ¶ C.

## B.    The Guidelines Provide For a Presumption for a Non-Custodial Sentence

Based on Mr. Werczberger's Guidelines range of 0-6 months, the Guidelines themselves contemplate a non-custodial sentence for Ben.  The parties and Probation uniformly calculate his Guidelines range at 0-6 months.  *See* Plea Agr. ¶ C; PSR ¶¶ 88, 90.

Ben's Guidelines falls squarely within Zone A of the Guidelines Table.  As such, although the Sentencing Table indicates a range of imprisonment of up to 6 months, U.S.S.G. § 5C1.1(b) directs that "a sentence of imprisonment is not required."  Application Note 2 further instructs that "where the applicable guideline range is in Zone A of the Sentencing Table (*i.e.*, the minimum term of imprisonment specified in the applicable guideline range is zero months), the court is not required to impose a sentence of imprisonment."  Indeed, with this low Guidelines range, a

financial penalty is often all that is warranted.  *See, e.g.,* U.S.S.G. § 5C1.1, App. N. 2 (financial punishment "appropriately may be imposed as the sole sanction.").

Application Note 10 elaborates that for "Zero Point Offenders in Zones A and B of the Sentencing Table," like Ben, a non-custodial sentence is ***presumptively appropriate***: "If the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zer-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the sentencing table, ***a sentence other than a sentence of imprisonment . . . is generally appropriate.***"  U.S.S.G. § 5C1.1, App. N. 10 (emphasis added).  Ben Werczberger meets these criteria.  Per the plea, his Guidelines calculation is within Zone A of the Sentencing Table, and he received a 2-level adjustment under U.S.S.G. §4C1.1 as a zero-point offender.  *See* Plea Agr. ¶ C.  The Guidelines thus encourage a non-custodial sentence.

## IV.    A TIME SERVED SENTENCE IS SUFFICIENT TO ACHIEVE THE TWIN AIMS OF FEDERAL SENTENCING: DETERRENCE AND REHABILITATION

While Ben has readily acknowledged the significance of his crime, only a time served sentence can properly calibrate "just punishment" that is "sufficient but not greater than necessary" to meet the sentencing statute's goals.  The experience of being arrested and convicted has profoundly affected Ben.  He is deeply ashamed of his conduct, and greatly distressed by the impact that his actions have had on his family.

Nor would a custodial sentence promote deterrence.  The sentencing statute requires that the Court impose a sentence that is "sufficient, but not greater than necessary," to "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant."  18 U.S.C. § 3553 (a)(2)(C), (D).  Ben has long since ceased any criminal conduct, and has already felt the consequences of this serious criminal case for nearly two years.  Whatever sentence the Court imposes, Ben will carry this felony conviction for the rest of his life—a harsh reality for

anyone in Ben's position that sends a stern message. Incarceration is thus unnecessary to deter

Ben, or others, from committing similar crimes. Only a time-served sentence would be sufficient,

but not greater than necessary, as required by the sentencing statute.

### A.    Ben is Deeply Sorry for His Crime

Ben is deeply remorseful, and readily accepts responsibility for his crime, telling

the Court:

> Never in my life before did I imagine I would be caught up in the criminal justice
> system. Yet, here I am, and I have no one to blame but myself.
>
> I've spent a lot of time in the last almost two years since my arrest thinking – how
> I could have committed the crime that brought me here before Your Honor awaiting
> sentencing? When I sit alone, I am overwhelmed by pain and sadness knowing
> what I've put my family through because of the mistakes and bad decisions I've
> made.
>
> . . .
>
> I failed as a role model for my family. For the first time in my life, I am terribly
> ashamed of myself. Judge, I am 72 years old. And I have worked so hard every
> day of my entire life trying to build something to support my family, and that my
> family could be proud of. As a young man I worked multiple jobs. And for the last
> 30 years, I've invested every day into building the company I founded into the
> successful business it is. I took pride in my accomplishments, and so did my family.
> I can't feel the same way anymore. Now, my credit is shot, I had to give up my
> business, and everyone in our close-knit community knows about crime. When I
> go for prayers at my synagogue, I can't hold my head up high like I used to. And
> neither can my family. We all see how people whisper when any of us walk into a
> room. I ruined not just my reputation, but the whole family's. I can no longer say
> that I hope my children and grandchildren follow in my footsteps. That is
> devastating
>
> I know that my crime deserves serious consequences. But I can't bear thinking
> about the toll my awful decisions have taken on my whole family and myself. I ask
> only for an opportunity to make it up to my wonderful family.

Ex. A, Ben Werczberger Ltr. at 1-2.

Ben is forthcoming about the gravity of his past wrongs, and is committed to never again

stray down the criminal path. *See* Ex. C, Herman Goldberger Ltr. at 2 ("I know Ben well; we talk

often and have been working together for decades. Since this happened, I've noticed a real change in him. He's genuinely sorry and has made that clear. His regret is obvious and it's clear that this whole situation has taken a toll on him, both in his personal life and work. You can see how much it's hurting him.").

His nearest and dearest see his anguish at the reality that his mistakes have upended the lives of his closest family members. Miriam Werczberger, Ben's wife of 52 years explains:

> Our family has been through so much because of this case. It's brought us public shame and stress, leaving us feeling embarrassed and humiliated in our close knit community. Our lives have completely changed—our lifestyle is different, our children are affected, and our credit and ability to manage everyday things have been hit hard.

> I see how this case has changed Ben. We've had countless conversations, and he's openly told me and the family how truly sorry he is for his mistakes. Just knowing that he did wrong and the toll it's taken on our children and grandchildren. He's always tried to set a good example for them, and it pains him deeply knowing that he failed at that most important aspect of life. I see the anguish and fret that plagues Ben when he doesn't know I'm looking,

Ex. B, Miriam Werczberger Ltr. at 2-3.

Ben's son Jacob describes how "this past year has been a really humbl[ing] experience, to say the least," as Ben has reckoned with the reality of his conduct. Ex. B, Jacob and Susan Werczberger Ltr. at 2. Ben is determined to make things right, and use his grave mistakes as cautionary lesson for his children and grandchildren. Jacob recounts:

> I have spent many hours talking and rehashing events of what happened [with my father] and how we got here. The regrets the mistakes and those wrong decisions, something he very much wants to make sure his future generations do not do the same. There is a saying "every person can make a mistake, but it takes a man to admit it". Taking responsibility and ownership and trul[]y being remorseful is something that I wall always remember and be inspired by.

Ex. B, Jacob and Susan Werczberger Ltr. at 2.

Ben is dedicated not to repeat his mistakes, and return to the stable, law-abiding life he did for the first many decades of his life. He is invested in moving past his criminal conduct, achieving

the deterrence and rehabilitation goals of sentencing. The Court should sentence Ben to a non-custodial sentence accordingly. *See, e.g., United States v. Ortega*, No. 09-cr-742, 2010 WL 2541364, at *2 (E.D.N.Y. June 17, 2010) (where a defendant has demonstrated fundamentally good character, "specific deterrence is not a major concern.").

### B.    Ben's Acceptance of Responsibility and Active Progress Towards Rehabilitation Serve as a Positive Model, Achieving General Deterrence

Nor is a custodial sentence necessary to promote general or specific deterrence. The sentencing statute requires that the Court impose a sentence that is "sufficient, but not greater than necessary," to "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553 (a)(2)(C), (D).

Ben's risk of recidivism is vanishingly low. He is a 72-year-old first time offender who has been released without incident during the pendency of this case. He is thus less likely to recidivate than virtually any other category of defendant, according to the United States Sentencing Commission's empirical research.[1] *See* "The Effects of Aging on Recidivism Among Federal Offenders," *U.S. Sentencing Commission*, at 22 (Dec. 2017) ("The Commission found that younger offenders were more likely to be rearrested than older offenders, were rearrested faster than older offenders, and committed more serious offenses after they were released than older offenders.").[2]

---

[1] David Farrington, "Age and Crime," Crime and Justice, Volume 7, 1987; A General Theory of Crime (Michael Gottfredson and Travis Hirschi, 1990); Crime in the Making(Robert Sampson and John Laub, 1993); Terri E. Moffitt, "Adolescence-Limited and Lifecourse-Persistent Antisocial Behavior," Psychological Review, 1993; American Youth Violence (Franklin E. Zimring, 1998) *see also* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, http://www.ussc.gov/publicat/Recidivism-General.pdf: "Recidivism rates decline consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates").

[2] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

Studies have repeatedly shown that recidivism rates also decrease markedly as an individual gets older, and Ben is well beyond the age of offenders where crimes are most prevalent. *See United States v. Hodges*, No. 07-cr-706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting that "post-*Booker*, courts have observed that recidivism is markedly lower for older defendants" and collecting cases); *United States v. Sanchez*, No. 99-cr-338, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) ("With regard to the necessity to protect society from future crimes of the defendant, this Court and others have previously declined to impose lengthy guidelines sentences on older defendants in light of the Sentencing Commission's conclusion that '[r]ecidivism rates decline relatively consistently as age increases.'" (citing U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12 (2004) and collecting cases)); *see also United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009) (reversing and remanding for resentencing because "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines").

Indeed, offenders who have a criminal history category of I and are over 50 years old, like Ben, recidivate a mere 6.2% of the time. *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines Release One,* Exhibit 9 (May 2004).[3] The subset of true "first offenders," those who have zero Criminal History points, are even less likely to re-offend. *See* Ex. Six to *Recidivism and the "First Offender" Release Two* (May 2004).[4] Only 3.5% of defendants in this category are arrested in the 24 months following initiation of probation

---

[3] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

[4] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf.

or release from confinement. *Id.; accord United States v. Oldani*, No. 09-cr-00010, 2009 WL 1770116, at *5 (S.D.W. Va. June 16, 2009) (observing that "[b]ased on empirical research, the commission found that a defendant with no prior arrests or criminal history has . . . the lowest rate of recidivism of any group in the study").

According to the Sentencing Commission's statistics, defendants sentenced for fraud crimes with a criminal history category of I are the *least likely to re-offend*. *See* Ex. 11 to *Measuring Recidivism.* Particularly given Ben's remorse, the goals of specific deterrence have already been met. A non-custodial sentence would achieve the deterrence envisioned by § 3553(a)(1)C). *See, e.g., United States v. Pizzino,* 419 F. App'x 579, 583-84 (6th Cir. 2011) (sentence vacated where court failed to address defendant's low risk of recidivism and extensive rehabilitation).

Ben has also long since ceased any criminal conduct. He plainly and painfully understands the severity of his mistakes. *See* Ex. A, Ben Werczberger Ltr. at 1. His only goals now are continuing to supporting his family as the patriarch everyone can count on, and investing in his community. Ben's internalization of the wrongfulness of his crimes since his arrest nearly two years ago is a penological success story that should be touted: if all criminal defendants exhibited a similar transformation following their arrest, our society would be profoundly better off. In other words, general deterrence goals are achieved without a custodial sentence. A custodial sentence would be "greater than necessary," contravening the sentencing statute.

A non-custodial sentence will also promote "respect for the law." See 18 U.S.C. § 3553(a)(2)(A). A recognition that the law is not one-size fits all that promotes punishment above all else is precisely the humanity that a just society seeks in its legal system. Meting out a sentence that fits not merely the crime, but that fits the person—including the personal remorse, acceptance

24

of responsibility and post-offense conduct—fosters respect for the law as a means of achieving a

just society.  That too is a basis for imposing a time served sentence on Ben.

## V.    THE PSR RECOMMENDS A TIME SERVED SENTENCE BASED ON THE REALITIES OF BEN'S LIFE AND THE LIMITED NATURE OF HIS OFFENSE CONDUCT

Recognizing the limited nature of Ben's crime, and focusing on his otherwise law-abiding

life, Probation similarly recommended a time served sentence:

> [W]e acknowledge that both Werczberger's specific conduct and personally derived profits were limited as compared to that of his co-conspirators. Additionally, we maintain that the history and characteristics of the defendant also merit consideration in this case. Werczberger is in his early 70s and a first-time offender who has otherwise lived a law-abiding life, and he has remained in compliance with conditions of his pretrial supervision while at liberty, thereby evincing that he will be a suitable candidate for community supervision. Additionally, the defendant has the benefit of education and vocational skills, as well as a loving and supportive family, all of which will serve to aid in his future endeavors.
>
> As such and taking all factors into consideration, ***we maintain that a sentence of Time Served*** . . . is appropriate in this case, pursuant to the factors outlined in 18 USC 3553(a). Specifically, we believe that this sentence will serve to promote respect for the law and satisfy the objectives of punishment and deterrence.

PSR at 33 (emphasis added).

Indeed, as Probation articulated and as is clear from Mr. Werczberger's plea, the scope of

his culpability was quite limited relative to the allegations in the case as a whole.  Mr. Werczberger

pled guilty to a conspiracy to make false statements to a bank in representing himself as President

of New York City Early Learning ("NYCEL") for purposes of the bank account.  As is clear from

Mr. Werczberger's plea agreement, Mr. Werczberger's offense conduct was narrow.  In contrast

to the sprawling allegations against the co-defendants in the Indictment, Mr. Werczberger's plea

was for this discrete offense that did not result in any loss to the bank.  Thus, Mr. Werczberger's

plea pegs his U.S. Sentencing Guidelines at 0-6 months—the lowest level available in the

Guidelines.    Plea at 1-2; ¶ A.

Even looking at the government's allegations more broadly, there was likewise no concrete loss to the children enrolled in NYCEL's childcare programs. That is consistent with the stipulated addendum to co-defendant Isidore Handler's PSR, which clarifies:

- "The Government does not dispute that *childcare services were provided by . . . NYCEL . . . using the proceeds of EHS-CCP grants*;"

- "PSCHS contracted with additional for-profit entities owned by MARTIN HANDLER . . . to provide services related to bussing, catering, teacher recruitment, and advertising in connection with PSCHS's daycare centers which were funded in part through federal Head Start and Early Head Start grants, including EHS-CCP grants. *The Government . . . does not affirmatively assert that these separate for-profit entities owned by MARTIN HANDLER . . . failed to provide services required under the contracts*;" and

- "The Government does not have sufficient evidence to measure the monetary value of the childcare services provided by PSCHS, through the for-profit entities owned by MARTIN HANDLER [NYCEL] . . . and the *Government does not affirmatively assert that the for-profit entities owned by MARTIN HANDLER . . . failed to provide childcare services required under the contracts*."

Gov. and I. Handler Proposed Joint PSR Addendum Stipulating Facts  ECF Doc. 256 at 5 (emphasis added).

With respect to the wider offense conduct allegations in the PSR, there thus is generally agreement between the government and Mr. Werczberger regarding the most significant facts of Mr. Werczberger's involvement with NYCEL.[5]  Specifically, that:

- NYCEL was a private for profit company, majority owned by Martin Handler.  Mrs. Werczberger was a minority shareholder with 12.5% interest.  *See* Indict. ¶¶ 5-6.

- Mr. Werczberger was a lender to NYCEL.  Indeed, Mr. Werczberger lent NYCEL several million dollars during the timeframe of the charges.  From Mr. Werczberger's perspective, these were corporate loans to NYCEL.  As "[t]he Government recognizes that Werczberger himself may believe that all of his loans were to NYCELC in its corporate capacity and none were to Martin Handler individually."  Gov. Ltr. re: Werczberger PSR at 1 (July 5, 2024).

---

[5] While the government and Me. Werczberger may disagree regarding the legal conclusions that may be appropriately drawn from the facts, because there is neither dispute about the facts or the applicable sentencing Guidelines, no *Fatico* hearing or extended sentencing proceeding is necessary.

- With the consent of Martin Handler, Mr. Werczberger opened a bank account at Dime Bank in the name of NYCEL through which his loans to NYCEL would be repaid. That account is the subject of Mr. Werczberger's plea ("Dime Account").

- The checks deposited into the Dime Account were made out to NYCEL from Project Social Care as part of an Early Head Start Childcare Partnership grant ("EHS-CCP") intended to provide enhanced services for certain NYCEL childcare programs. The government recognizes that under the EHS-CCP grant, "[c]ontractors [like NYCEL] may use their own non-federal grant monies to carry out a project or program under a federal EHS award and then seek reimbursement from the HHS Grantee for the services they provided. ***Accordingly, NYCEL . . . could utilize [its] own funds to provide EHS-CCP services, and at the end of the month, could submit monthly funding request forms detailing the number of children enrolled in the EHS-CCP program***." *See* Gov. and I. Handler Proposed Joint PSR Addendum Stipulating Facts ECF Doc. 256 at 5 (emphasis added). In other words, under the EHS-CCP grant, since money is fungible, other funds in NYCEL's operating account were used to pay for those enhanced services, and NYCEL received the EHS-CCP funding at the end of the month similar to reimbursement, some of which was deposited into the Dime Account.

- "The Government does not dispute that childcare services were provided by . . . NYCEL . . . using the proceeds of EHS-CCP grants." Gov. and I. Handler Proposed Joint PSR Addendum Stipulating Facts ECF Doc. 256 at 5. "The Government does not have sufficient evidence to measure the monetary value of the childcare services provided by PSCHS, through the for-profit entities owned by MARTIN HANDLER [NYCEL] . . . and the Government does not affirmatively assert that the for-profit entities owned by MARTIN HANDLER . . . failed to provide childcare services required under the [EHS-CCP] contracts." Gov. and I. Handler Proposed Joint PSR Addendum Stipulating Facts ECF Doc. 256 at 5. In other words, NYCEL provided childcare services under the EHS-CCP without regard to the funds deposited in the Dime Account.[6]

- During the Indictment's timeframe, Mr. Werczberger was the chairman of the NYCEL Head Start Board. Importantly, "the Government does not affirmatively assert that the for-profit entities owned by MARTIN HANDLER . . . failed to provide childcare services required under the contracts." Gov. and I. Handler Proposed Joint PSR Addendum Stipulating Facts ECF Doc. 256 at 5. Thus, while the government alleges that Mr. Werczberger's obligations as a board member were in conflict with his financial interests in repayment of his loans to NYCEL, there is no actual conflict between Mr. Werczberger's interests as a lender to NYCEL and NYCEL's interests as a for profit childcare company.[7]

---

[6] Accordingly, Mr. Werczberger's Sentencing Guidelines reflect a zero loss. *See* Plea Agr. ¶ C.

[7] Instead, as a practical matter, their interests were aligned as both Mr. Werczberger and NYCEL had an interest in NYCEL's continued success.

- With respect to the salaries to Mr. Werczberger's wife and grandson, the parties agree that Mrs. Werczberger was a 12.5% shareholder in NYCEL. Thus, she was entitled to payments from NYCEL as a shareholder, although perhaps those distributions should have been paid in a different form. And Mr. Werczberger's grandson is an ordained rabbi, hired to provide religious consultation on issues arising at the daycare centers. Whatever services he performed for NYCEL, that was the intent when he was put on payroll. The parties agree that these allegations have no impact on Mr. Werczberger's Sentencing Guidelines calculation.

Looking closely at the details of the allegations against Mr. Werczberger, it is clear that Mr. Werczberger's conduct was but a narrow slice of the broader allegations involving NYCEL and Project Social Care. Mr. Werczberger accepts full responsibility for his role in the offense, and will forever be marred with a felony record and its collateral consequences. Nonetheless, because of the limited nature of his conduct, a time served sentence is sufficient but not greater than necessary to serve the goals of the sentencing statute. *See* PSR at 33 ("we acknowledge that both Werczberger's specific conduct and personally derived profits were limited as compared to that of his co-conspirators. Additionally, we maintain that the history and characteristics of the defendant also merit consideration in this case. Werczberger is in his early 70s and a first-time offender who has otherwise lived a law-abiding life . . . As such and taking all factors into consideration, we maintain that a sentence of Time Served . . . is appropriate in this case, pursuant to the factors outlined in 18 USC 3553(a).").

## VI.    CONCLUSION

For the reasons stated above, Defendant Ben Werczberger respectfully requests that this Court impose a sentence of time served, which would be sufficient but not greater than necessary to accomplish the objectives set forth in 18 U.S.C. § 3553(a).

Dated: August 27, 2024                   Respectfully submitted,
        New York, New York

                                         MEISTER SEELIG & FEIN PLLC

                      By:        /S/
                              _____

                                         Henry E. Mazurek
                                         Ilana Haramati
                                         125 Park Avenue, Suite 700
                                         New York, New York 10017
                                         hem@msf-law.com
                                         ih@msf-law.com

                                         *Attorneys for Defendant Ben Werczberger*